**Slip Op. 03-164**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |
|---|---|
| | : |
| AL TECH SPECIALTY STEEL CORP., CARPENTER | |
| TECHNOLOGY CORP., REPUBLIC ENGINEERED | : |
| STEELS, TALLEY METALS TECHNOLOGY, INC. | |
| and UNITED STEEL WORKERS OF AMERICA, | : |
| AFL-CIO/CLC, | |
| | : |
| *Plaintiffs*, | |
| | : |
| v. | |
| | : |
| UNITED STATES OF AMERICA and | Court No. 98-10-03062 |
| THE UNITED STATES INTERNATIONAL | :  **[PUBLIC VERSION]** |
| TRADE COMMISSION, | |
| | : |
| *Defendants*, | |
| | : |
| and | |
| | : |
| KRUPP EDELSTAHLPROFILE GMBH and | |
| KRUPP HOESCH STEEL PRODUCTS, INC., | : |
| | |
| *Defendant-Intervenors.* | : |

_____

[Plaintiffs' Motion for Judgment Upon the Agency Record is denied.]

December 16, 2003

    Collier Shannon Scott, PLLC (Laurence J. Lasoff, Robin H. Gilbert and R. Alan Luberda), for Plaintiffs.

    Lyn M. Schlitt, General Counsel;(Charles A. St. Charles), Office of the General Counsel, United States International Trade Commission, for Defendant.

    Hogan & Hartson LLP (Lewis E. Leibowitz, Craig A. Lewis, and Stephen F. Propst), for Defendant-Intervenors.

## **OPINION**

RIDGWAY, Judge:

Plaintiffs AL Tech Specialty Steel Corp., Carpenter Technology Corp., Republic Engineered Steels, Talley Metals Technology, Inc., and United Steel Workers of America, AFL-CIO/CLC (collectively, "Plaintiffs" or "Domestic Industry") challenge the determination by the United States International Trade Commission (the "Commission") that imports of stainless steel wire rod ("SSWR") from Germany were "negligible" within the meaning of 19 U.S.C. §§ 1673d(b)(1) and 1677(24)(A)(i).[1] Stainless Steel Wire Rod From Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, 63 Fed. Reg. 49,610 (Int'l Trade Comm'n Sept. 16, 1998) ("ITC Final Determination"). By operation of law, the Commission's finding of negligibility terminated its antidumping investigation of imports from Germany. 19 U.S.C. 1673d(b)(1).

For the reasons set forth below, Plaintiffs' motion for judgment on the agency record is denied.

---

[*]This Public Version of the Court's opinion has been redacted to protect business proprietary information. Redactions are reflected by empty brackets, except that, for the sake of readability – wherever possible – a description or characterization of the redacted information has been substituted for the proprietary information. Those descriptions or characterizations appear in italics within the brackets.

[1]Stainless steel wire rod is identified as "stainless steel products that are hot-rolled or hot-rolled annealed and/or descaled rounds, squares, octagons, hexagons, or other shapes, in coils, that may also be coated with a lubricant containing copper, lime or oxalate. . . . . Stainless steel wire rod is provided for in subheading 7221.00.00 of the Harmonized Tariff Schedule (HTS) with a 1998 column 1-general tariff rate of 2.8 percent *ad valorem*, applicable to products of each of the subject countries." ITC Final Determination, 63 Fed. Reg. at 49,610 n.1.

## I. Background

Plaintiffs filed an antidumping duty petition with the United States Department of Commerce ("Commerce") and the Commission against imports of SSWR from Germany and other countries on July 30, 1997.[2] Complaint ¶ 6. The petition alleged that these SSWR imports "are being, or are likely to be, sold in the United States at less than fair value within the meaning of [19 U.S.C. § 1677], and that such imports are materially injuring an industry in the United States." Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, 62 Fed. Reg. 45,224 (Dep't Commerce Aug. 26, 1997). Both Commerce and the Commission instituted preliminary antidumping investigations. Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, 62 Fed. Reg. 42,263 (Int'l Trade Comm'n Aug. 6, 1997); Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, 62 Fed. Reg. 45,224 (Dep't Commerce Aug. 26, 1997).

During the preliminary injury investigation, Defendant-Intervenors Krupp Edelstahlprofile GmbH ("KEP") and Krupp Hoesch Steel Products, Inc. (collectively, "Krupp") argued that imports of SSWR from Germany were "negligible" within the meaning of 19 U.S.C. § 1673b(a)(1) and § 1677(24)(A)(i). Public Record ("P.R.") 102, Confidential Record ("C.R.") 27, Post-Conference Brief on Behalf of Krupp Edelstahlprofile GmbH and Krupp Hoesch Steel Products, Inc. at 25-33. Krupp noted a discrepancy between the "official" import data and its own records with respect to German imports of SSWR when it noted a concentration of German imports under the tariff

---

[2]The Commission reviewed investigations of imports of SSWR from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan. Only the Commission's negligibility determination with respect to imports of SSWR from Germany is at issue here. Complaint ¶ 1. See ITC Final Determination, 63 Fed. Reg. 49,610.

subheadings 7221.00.0045 HTSUS (stainless steel wire rod with cross-sections exceeding 19mm) and 7221.00.0075 (coiled stainless steel wire rod and bars of non-circular cross-sectional profiles) when it actually only shipped [*a relatively low number of*] tons. C.R. 27 at 32, C.R. 76 at 2-4. Specifically, it argued that statistics showing 1,024 tons – or 44% – of German imports were classified under subheadings 7221.00.0045 and 7221.00.0075 could not be correct since Krupp [

] and the Commission estimated Krupp accounted for [*a very high percentage*] of all SSWR imports from Germany as of September 1997. P.R. 102/C.R. 27 at 32; C.R. 76 at 3-4, C.R. 43, Stainless Steel Wire Rod From Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, Staff Report to the Commission on Inv. No. 701-TA-373 and Nos. 731-TA-769 through 775 (Prelim.) ("Preliminary Staff Report") at VII-3 n.3 (Sept. 8, 1997).

The Commission Staff noted a "discrepancy between official statistics on imports from Germany and the numbers reported by [*one company*] in the foreign producer questionnaire and [*another company*] in the importer's questionnaire." C.R. 173. Specifically, official import statistics showed [*a major inconsistency compared to*] reported imports and exports in 1996. C.R. 173. Official statistics showed 1,655 short tons of SSWR imported from Germany, but questionnaire responses reported only [*a much smaller quantity*] exported to the United States. C.R. 43, Preliminary Staff Report, IV-4 (Table IV-2), VII-2 to -3 (Table VII-1). When asked about the discrepancy, counsel for Krupp guessed that the problem could be misclassification of goods or mislabeled country of origin. C.R. 173. Counsel for Krupp requested that the Commission, in the event of a final investigation, "do an extensive analysis" to trace "exactly where the shipments were originating." C.R. 173.

The Commission published notice of its preliminary affirmative determination that there was "a reasonable indication that an industry in the United States [was being] materially injured or threatened with material injury by reason of imports from Germany . . . of stainless steel wire rod that [were allegedly being] sold in the United States at less than fair value (LTFV)." Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, 62 Fed. Reg. 49,994 (Int'l Trade Comm'n Sept. 24, 1997) ("ITC Preliminary Determination"); *see* P.R 144, Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, Inv. Nos. 701-TA-373 and Nos. 731-TA-769-775 (Prelim.), USITC Pub. 3060 ("Preliminary Commission Views") at IV-1 at 3 n.1 (Sept. 1997). In its preliminary determination, the Commission relied on the unadjusted, official U.S. import statistics for imports for consumption to find that imports of SSWR from Germany accounted for more than three percent of total imports for consumption during twelve months prior to the petition for which information was available, that is July 1996 through June 1997. P.R. 144, Preliminary Commission Views at 14. The Commission also noted Krupp's argument to the contrary. P.R. 144 at 14.

Commerce also published notice of a preliminary affirmative determination that imports of SSWR from Germany were being sold for less than fair value.[3] Stainless Steel Wire Rod From

---

[3]In its investigation of stainless steel wire rod from Germany, Commerce sent a questionnaire on September 19, 1997 to two potential producers and/or exporters of the subject imports to the United States: Krupp and BGH Edelstahl Freital GmbH ("BGH Edelstahl"). DOC Preliminary Determination, 63 Fed. Reg. at 10,847. Krupp only responded to one section of the questionnaire, and BGH Edelstahl did not respond at all to the questionnaire. *Id.* Based on the companies' failure to fully respond to Commerce's questionnaires, Commerce determined that the use of adverse facts available was "warranted with respect to both companies." DOC Preliminary Determination, 63 Fed. Reg. at 10,848. Commerce then based the companies' dumping margins on information from the petition (as adjusted by Commerce at the time of initiation). *Id.*

Germany, 63 Fed. Reg. 10,847 (Dep't Commerce Mar. 5, 1998) ("DOC Preliminary Determination"). Commerce later issued a final determination that imports of SSWR from Germany were being sold at less than fair value, stating it would impose final antidumping duties on the imports if the Commission found material injury, or threat of material injury.[4] Stainless Steel Wire Rod From Germany, 63 Fed. Reg. 40,433 (Dep't Commerce July 29, 1998) ("DOC Final Determination").

On February 26, 1998, Krupp again raised the issue of the apparent discrepancies in the official import statistics with the Commission. C.R. 270. Krupp noted the possibility that [     ] non-German material may have been included in the statistics. C.R. 270. Two weeks later, counsel for Krupp spoke with the Commission noting its concern that "there is a misclassification in the official statistics" because "[*of a significant discrepancy in official statistics on imports of stainless steel wire rod from Germany compared to*] the exports from Germany to the United States reported by the [        ] major producers/exporters in Germany." C.R. 270. The Commission then began the final phase of its injury investigation on March 23, 1998. *See* Stainless Steel Wire Rod From Germany, Italy, Japan, Korea, Spain, Sweden and Taiwan, 63 Fed. Reg. 13,872 (Int'l Trade Comm'n Mar. 23, 1998) (scheduling of final phase of countervailing duty and antidumping investigations).[5]

---

[4]As it found in its preliminary determination, Commerce found that imports of SSWR from Germany had margins ranging from 19.45 to 21.28 percent *ad valorem*. DOC Final Determination, 63 Fed. Reg. at 40,434. *See also* Complaint ¶ 9.

[5][*Another*] importer also raised questions as to the accuracy of German import statistics. *See* C.R. 398 [

].

Ultimately, the Commission Staff reported two major discrepancies between official import statistics and questionnaire responses that resulted in the Commission Staff adjusting the official statistics. P.R. 481/C.R.81 Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden and Taiwan, Report to the Commission on Investigations Nos. 70-9A-373 (Final) and 731-9A-769 through 775 (Final) ("Final Staff Report"), F-18 to -19, (Table F-8) nn.1-4. The first significant discrepancy was a difference in import volumes of [*Company A*]; [*Company A*] imports were misclassified, so the Commission Staff excluded the misclassified imports. *See id.* [*Company A*] reported [      ] imports of SSWR during July 1996 through June 1997 on its certified questionnaire response. C.R. 102. But official import statistics showed [*Company A*] as having imported a significant tonnage of SSWR during that period. C.R. 81, Final Staff Report at F-18 to -19, Table F-8 & n.2.

Commission Staff contacted the U.S. Customs Service[6] to obtain import data, sorted by importer, C.R. 274, and contact information for manufacturers for which Commission Staff could only identify a manufacturer code. C.R. 275. Customs identified [*a particular German manufacturer*]. C.R. 276. Commission Staff reviewed the import data sent by Customs and noted that [*a substantial proportion of*] imports classified under one subheading under investigation were imported by [*Company A*]. C.R. 545. Further, Commission Staff noted that imports from [*the German manufacturer identified by Customs*] tracked "almost exactly with publically official statistics." C.R. 561.

---

[6]The United States Customs Service was renamed effective March 1, 2003, and is now organized as the United States Bureau of Customs and Border Protection. See Homeland Security Act of 2002, Pub. L. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002); Reorganization Plan for the Department of Homeland Security, H.R. Doc. No. 108-32 (2003).

Commission Staff called [*a representative of Company A*] to ask for an explanation of the large discrepancy between [*Company A's*] report of [      ] imports from Germany and the import volume recorded in official import statistics.[7]  C.R. 426.  The response was "that [*Company A's*] 'major product by far' in the past several years has been [*a particular type of steel product*]; [*Company A*] imports [*that type of product*], not [*steel of the type subject to the investigation*]."  C.R. 426.  Commission Staff probed, asking if [*the steel product imported by Company A*] may fall under the scope definition in these investigations, and [*the representative of Company A*] said no. Commission Staff called a second time to ask about the physical characteristics of the good imported by [*Company A*], but [*Company A's*] description did not conform with that of the merchandise subject to the investigation.  C.R. 426.  [*Company A*] did admit to importing SSWR in previous years; and, when told that at least some of its nonconforming imports were classified as SSWR, [*the representative of Company A*] stated "[*he would make inquiries to determine whether there had been a misclassification*]."  C.R. 426.

The Commission Staff followed up with [*Company A*], asking for written confirmation of the statements made in telephone conversations that the imports classified in official statistics as SSWR attributable to [*Company A*] were actually misclassified and not subject to the investigation. C.R. 545. [*Company A*] complied with the request by sending written confirmation that "[*all its imports from Germany were of a steel product other than the subject merchandise*]."  C.R. 550. Commission Staff then contacted [*the German manufacturer that Customs had identified*] by fax to

---

[7]Commission Staff expressed concern about whether official import data was accurate in an email sent to [

         ]:  "Since official stats have been called into question, at least with respect to Germany, I would like to feel very comfortable that the foreign data and US import data are correct."  C.R. 400.

inquire into [*the manufacturer's*] production facilities and production of SSWR. C.R. 558. Bollinghaus replied by fax, explaining [*the limitations of its facilities*] and certifying its [      ] answer to the questionnaire inquiry, "Has your firm produced stainless steel wire rod since January 1, 1995?" C.R. 568.

The second discrepancy was a difference in import volumes due to allegedly mislabeled countries of origin by importer, [*Company B*]. The resulting adjustment was the exclusion of [*a substantial percentage*] of the imports originally labeled as German. *See* C.R. 81, Final Staff Report, F-18 to -19 (Table F-8) n.4. The Commission Staff was first alerted to the possibility that the official statistics may be unreliable regarding [*Company B's*] imports when it contacted and received confirmation from [*Company B*] that [*a particular German supplier*], from which [*Company B*] imported all its SSWR, was the company listed as the manufacturer of the SSWR shipped to [*Company B*] but was not a producer of SSWR. C.R. 274; C.R. 81 Final Staff Report F-18 (Table F-8) n.1; C.R. 280, Letter from [                                                   ]. [*The president of Company B*] explained to the Commission Staff that [*Company B's supplier*] purchased SSWR from European sources, tested the SSWR, then shipped it to [*Company B*]. C.R. 274. Accordingly, Commission Staff "asked [*the president of Company B*] to identify his imports by individual producers" on the Importer's Questionnaire he was to file with the Commission. C.R. 274. Official import statistics showed that all [*Company B's*] SSWR imported from [*its supplier*] was designated as originating in Germany. Final Staff Report, C.R. 81, F-19 (Table F-8) n.4. [*The president of Company B*] memorialized the conversation by way of letter to Commission Staff

reiterating that [*Company B's supplier*] did not produce SSWR, purchasing SSWR from European sources instead, and shipping the purchased SSWR to [*Company B*].  C.R. 280.

[*Company B*] indicated [*that a certain percentage of its imports were of German origin, with the remainder from a second country*] – without any tonnage breakout – by handwritten marking next to country selections and in response to the share-of-imports question on its Importer's Questionnaire. C.R. 396.  After receiving the questionnaire, Commission Staff called [*Company B's president*] and wrote a letter requesting "a better breakout of [*the two countries of origin*]," and suggesting, "(I believe you said that maybe the grades or the 'heat' classification might help you?)" C.R. 492V. [*Company B's president*] responded to the further inquiry on behalf of [*Company B*] by sending a letter with a print out of [*Company B's*] vessel list containing SSWR import data from July 1996 through June 1997.  C.R. 496.

The vessel list included handwritten notations in the country-of-origin column stating [*the origin of material – either Germany or the second country*].  C.R. 496.  The word "Germany" appears [*a number of*] times; and each time lines extend from the word to material-weight figures in the weight column, indicating which material volumes are associated with the country label.  C.R. 496.  One group of material volumes in the weight column corresponding to [*the second country*] is similarly marked.  C.R. 496.  But most groups of volumes from the weight column have an arrow pointing from material volume subtotals appearing in the weight column to [*the name of the second country*] in the country-of-origin column.  C.R. 496.  Further, each material volume has a corresponding "heat code" in a column labeled "Heat #," to the right of the country-of-origin

column.  C.R. 496.  Every material volume marked [*with the name of the second country*] has a corresponding [*heat number of a particular type*], and every material volume marked "Germany" has a corresponding [*heat number of a different type*].  C.R. 496.

Commission Staff noted that, while the certified questionnaire "estimated a [*particular*] split in imports between Germany and [*the second country*] . . . in subsequent information [that [*the president of Company B*]] submitted it appears that [*a substantial percentage*] of his imports were from [*the second country*]."  C.R. 597.  [*The president of Company B*] confirmed the approximate [*ratio of material of German origin to that of second country origin*].  C.R. 597.

Commission Staff then prepared a worksheet comparing the import and country-of-origin information provided by [*Company B*] with official import statistics.  C.R. 603.  Commission staff noted, "there are a number of instances where the date appearing in the Customs Net Import File (CNIF) differs from the date appearing in the vessel list supplied by [*Company B*]; however, even with this inconvenience, the correlation between the data is obvious."  C.R. 603.  In the worksheet, Commission Staff labeled [*a number of*] groups of import volumes as "unknown" country of origin.  C.R. 603.  The marked-up copies of the vessel lists—used by Commission Staff to prepare the comparison chart—show that the "unknown" volumes of material were volumes at the beginning of groups of volumes in the weight column before a subtotal of material volume by weight, but were volumes not included in the subtotal.  C.R. 603.  Further, in each case of an "unknown" volume, the "unknown" group was sandwiched between volumes [*identified as being of second country*] origin, and had no intervening subtotal which would create an obvious break in the numbers in the column of import volumes by weight."  C.R. 603.  Moreover, each "unknown" volume has a corresponding

[*heat code of the particular type associated with origin in the second country*].  C.R. 603.  The Staff

Report explains that "[

]."  C.R. 81 <u>Final Staff Report</u>,  F-19, (Table F-8)

n.4.

Approximately [     ] percent of [*Company B's*] imports on the vessel list were not marked

with any country of origin.  C.R. 81, <u>Final Staff Report</u>, F-19, (Table F-8) n.4.  The percentage break

down of [*Company B's*] imports with country-of-origin markings—according to [*the company

president's*] handwritten notations—was [     ] percent [*second country origin*] and [     ] percent

German.  *Id.*  The Commission Staff extrapolated the same [*country of origin ratio derived*] from

the [*material of known origin*] to the [   ] percent of imports the Commission Staff labeled as having

"unknown" origin.  C.R. 81, <u>Final Staff Report</u> F-19 (Table F-8) n.2; C.R. 603.

As a result of its investigation, the Commission Staff concluded that official imports from

Germany were overstated, because: (1) "they include [*stainless steel wire rod of second country

origin*] that was shipped to [*Company B*] by [*its sole supplier, which does not manufacture SSWR*]";

and (2) "imports of [*a steel product other than stainless steel wire rod*] by [*Company A*] into [*a

specific U.S. port*] from Germany, [*and two other countries*] are misclassified as stainless steel wire

rod."  P.R. 481/C.R. 81, <u>Final Staff Report</u> at IV-3.

The Commission Staff then adjusted the "official" import statistics for the data covering the

twelve-month period prior to the petition (the data used for the negligibility analysis) to account for

these discrepancies by [*the two companies*].  *See* P.R. 481/C.R. 81, <u>Final Staff Report</u> at IV-4 (Table

IV-1) (U.S. Imports, questionnaire data, period of investigation, by source), F-8 to 9 (Table F-3)

(U.S. Official Imports for Consumption as adjusted by Commission staff, period of investigation, by source), F-10 to 11 (Table F-4) (U.S. Imports, questionnaire data, period of investigation, by firm); F-13 (Table F-5) (U.S. Imports, official data, imports for consumption adjusted for misclassification).

The Final Staff Report included negligibility calculations based on imports-for-consumption and general-imports data, both unadjusted and adjusted for errors. *See generally* P.R. 481/C.R. 81, Final Staff Report at F-13 (Table F-5), F-18 to -19 (Table F-8). Specifically, using official imports-for-consumption statistics, *adjusted for inaccuracies* imports from Germany accounted for 2.76 percent of all SSWR imports during the 12-month period preceding the filing of the petition (July 1996 through June 1997). P.R. 481/C.R. 81, Final Staff Report at F-13 (Table F-5).

Using general-imports statistics, the Commission Staff determined that "*adjusted* German imports . . . accounted for only 2.94 percent of total adjusted imports." P.R. 481/C.R. 81, Final Staff Report at F-18 to -19 (Table F-8). "[*U*]*nadjusted*, the official U.S. [general-imports] statistics show a 4.74 percent share for Germany." Pls.' Brief at 8-9 (emphasis added) (*citing* P.R. 481/C.R. 81, Final Staff Report, F-18 to -19 (Table F-8 nn.1-4) ).

Based on this data, the Commission determined that for the purposes of its present-material-injury analysis, imports of SSWR from Germany were negligible during the twelve months preceding the filing of the petition. *Id.*; *see* ITC Final Determination, 63 Fed. Reg. at 49, 610; *see also* Complaint ¶ 10. Specifically, four of the five participating Commissioners relied on the negligibility calculation based on the imports-for-consumption data series and determined that imports from Germany accounted for 2.76 percent of total adjusted imports. *See* P.R. 481/C.R. 81

at 12 & n. 43, Final Staff Report, Table F-5. All five of the participating Commissioners found that the imports would be negligible if the ratio for German imports were calculated using the adjusted "general" imports data series. P.R. 506, Final Commission Views at 12 n.43. None of the participating Commissioners relied on the unadjusted official data for either imports for consumption or general imports. Def.-Intervenors' Brief at 28. Further, although the Commission majority found "a potential that subject imports from Germany will imminently account for more than three percent of total SSWR imports in the relevant 12-month period," it concluded that "an industry in the United States is not threatened with material injury by reason of imports of SSWR from Germany that have been found by Commerce to be sold at LTFV."[8] P.R. 506, Final Commission Views at 4-5, 23; *see also* ITC Final Determination, 63 Fed. Reg. at 49,610 n.5.

This action ensued, challenging the Commission's final determination that there was no present material injury by reason of subject imports from Germany because such imports were "negligible" within the meaning of 19 U.S.C. § 1673d(b)(1) and § 1677(24)(A)(1). *See, e.g.,* Complaint ¶¶ 5, 12. Plaintiffs argue that by basing the determination on imports-for-consumption data instead of general-imports data, the Commission relied on the wrong set of official import statistics. *See* Pls.' Brief at 1, 9-10, 13, 23-25; Pls.' Reply Brief at 1-14. Plaintiffs also contend that

---

[8]In contrast, because Commissioner Crawford found that imports of SSWR from Germany would *not* imminently exceed the three percent negligibility threshold, she did not go on to consider those imports for purposes of determining threat of material injury. *See* C.R. 644, Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden and Taiwan, Inv. No. 701-TA-373 & 731-TA-769-775 (Final) (Sept. 16, 1998) ("Confidential Commission Views") at 48-51 (dissenting views of Commissioner Crawford). Commissioner Crawford's finding is not at issue in this action.

the Commission should not have relied on adjustments made by the Commission staff to the official import statistics based on data provided by importers. *See* Pls.' Brief at 1, 3, 9, 14-26; Pls.' Reply Brief at 15-31.

Jurisdiction lies under 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 2636(c).

## II.    Standard of Review

In reviewing a challenge to the Commission's final determination in an antidumping case, the Commission's determination must be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

The party challenging the Commission's finding "bears the burden of proving the evidence is inadequate." Micron Tech., Inc. v. United States, 117 F.3d 1386, 1397 (Fed. Cir. 1997). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) (*quoting* Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (defining "substantial evidence" as "something less than the weight of the evidence"). "'It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record.'" Timken Co. v. United States, 913 F. Supp. 580, 583 (CIT 1996) (quoting Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd, 894 F.2d 385 (Fed. Cir. 1990)). Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620

(1966) (citations omitted).

### III.  Analysis

In antidumping investigations, the Commission determines whether

(A)     an industry in the United States –

  (i)      is materially injured, or
  (ii)     is threatened with material injury, or

(B)     the establishment of an industry in the United States is materially retarded,

by reason of imports, or sales (or the likelihood of sales) for importation, of the
merchandise with respect to which the administering authority has made an
affirmative determination under subsection (a)(1) of this section. *If the Commission
determines that imports of the subject merchandise are negligible, the investigation
shall be terminated.*

19 U.S.C. § 1673d(b)(1) (1994) (emphasis added).  The Statement of Administration Action

("SAA") is to the same effect.  SAA at 855.

The Commission's negligibility analysis is specifically guided by Section 771(24) of the

Tariff Act of 1930, as amended by the URAA, which provides that imports are considered

"negligible" if such imports "account for less than 3 percent of the volume of all such merchandise

imported into the United States in the most recent 12-month period for which data are available that

precedes" the filing of the petition. 19 U.S.C. §1677(24)(A)(i) (1994).  In this case, the Commission

determined that imports of SSWR from Germany were negligible during the relevant twelve month

period preceding the filing of the petition—July 1996 through June 1997. ITC Final Determination,

63 Fed. Reg. 49,610; *see also* P.R. 506, Final Commission Views at 20-22.

The plaintiff Domestic Industry here argues (a) that the Commission erred in relying on statistics concerning "imports for consumption" (rather than "general imports") in reaching its negligibility determination;[9] and (b) that certain adjustments made to the official statistics are not supported by substantial evidence. Although the Commission based its determination on "imports for consumption," it also analyzed the "general imports" data – the data that Plaintiffs urged. Like its analysis based on statistics concerning imports for consumption, the Commission's analysis of statistics on general imports concluded that German imports were negligible. Accordingly, because – as detailed below – the adjustments are supported by substantial evidence in the record and are otherwise in accordance with law, there is no need to reach Plaintiffs' other issue.

### A.    [*Company A*] Adjustments

As discussed in section I above, the Commission adjusted the official statistics to reflect information supplied by [*Company A*] in the course of the investigation indicating that imports from Germany, [*and two other countries*] –  which had been declared to Customs to be SSWR – were, in fact, instead "[*another steel product*]." The Domestic Industry contends that – for two reasons – the Commission's adjustments to [*Company A's*] data are not supported by substantial evidence on the record, and are otherwise contrary to law. *See generally* Plaintiffs' Brief at 3, 9, 21-23; Plaintiffs' Reply Brief at 27-30.

---

[9]Imports-for-consumption data "measure the total merchandise that has physically cleared through Customs, either entering consumption channels immediately or as withdrawals from bonded warehouses under Customs custody or from foreign trade zones." Def.'s Response Brief at 3 (*citing* Guide to Foreign Trade Statistics (Dep't Commerce Dec. 1992)).

First, the Domestic Industry seeks to depict [*Company A*] as untrustworthy, and to cast doubt on the "accuracy, reliability, and probative value" of the information it provided – emphasizing that, at the time it made its disclosure, the company knew that a negligibility determination would result in no liability for antidumping duties; suggesting that the company may have intentionally misclassified its merchandise to obtain the lower customs duty rate applicable to SSWR; and questioning whether the company ever reported the misclassification to Customs. Plaintiffs' Brief at 21-22; Plaintiffs' Reply Brief at 27-30. The Domestic Industry asserts that, at a minimum, [*Company A*] is guilty of misrepresentation to at least one of the two federal agencies and that, under the circumstances, the Commission erred in "simply tak[ing] the importer's word for what it said had occurred regarding its imports." Plaintiffs' Brief at 22.

As an initial matter, it is worth noting – in the context of the Domestic Industry's challenges to the reliability of information provided by [*Company A*] – that the credibility of sources is largely a matter within the province of the Commission, as the trier of fact. *See generally* Defendant-Intervenors' Brief at 58-59.

But, contrary to the Domestic Industry's claims, the Commission did not blindly accept [*Company A's*] statements at face value. As section I above explains, discrepancies in the official import data first came to the Commission's attention in the preliminary phase of the investigation, when counsel to the German producers noted in post-conference briefing that the official data showed an inexplicable concentration of German imports in one particular HTSUS subheading, covering material with circular cross-sections exceeding 19 mm. Those data could not be reconciled with the fact that KEP – which accounted for [*a very high percentage*] of total German imports – had

shipped a [                              ] quantity of the material in the relevant twelve-month period.  C.R. 43,

Preliminary Staff Report at VII-3; C.R. 27 at 32.

After analyzing the foreign producer and importers' questionnaire data, the Commission staff

expressed similar concerns about the vast "discrepancy between official statistics on imports from

Germany and the numbers reported by [*one company*] in the foreign producer questionnaire and

[*another company*], in the importer's questionnaire."  C.R. 173.  The staff investigator further noted

that "the numbers in the official statistics are [*significantly higher in calendar year 1996 than*] the

reported import and export numbers."  *Id*.  Indeed, the Preliminary Staff Report showed that –

according to the official statistics – 1996 imports of SSWR from Germany totaled 1,655 short tons,

while foreign producer questionnaire data reflected total shipments to the United States of [*a

significantly smaller*] quantity.  *See* C.R. 43, Preliminary Staff Report, at IV-4 (Table IV-2) and VII-

3 (Table VII-1).  When asked about the discrepancy, counsel to the primary German producer

suggested that the problem might lie with the large diameter material, and requested that – in the

event of a final investigation – the Commission "do an extensive analysis" to trace "exactly where

the shipments were originating."  *Id*.

The concerns about these discrepancies in the official import data continued unabated into

the final phase of the Commission's investigation.  In late February 1998, counsel for KEP spoke

with the Commission investigator, seeking a meeting to discuss "issues specific to the exports from

Germany, for example some shipments classified as German are not German (they may be

transhipments)."  C.R. 270.  Counsel spoke with the Commission staff again in mid-March 1998,

emphasizing that "[*there was a significant discrepancy in official statistics on imports of stainless*

*steel wire rod from Germany compared to*] the exports from Germany to the United States reported

by the [               ] major producers/exporters in Germany." Counsel indicated his belief that

misclassification was involved, and asked that the Commission staff "look into this matter." *Id.*

The source of counsel's concern was manifest in the official import statistics, which indicated

that a substantial volume of the imported, allegedly "German" material consisted of stainless steel

coiled bars with diameters of 19 mm or more, and coiled stainless steel wire rod and bars of non-

circular cross-sectional profiles. However, as Krupp noted in post-hearing briefing, the official data

could not be correct, and could not accurately reflect imports of German material, because the

evidence compiled in the final investigations indicated that KEP – which was by far the largest

German producer and exporter of subject merchandise – [                                          ]

non-circular product (subheading 7221.00.0075, HTSUS) or coiled bar (subheading 7221.00.0045,

HTSUS) to the United States during the relevant period. C.R. 76 at 3. Similarly, the only other

German producer of SSWR – [         ] – advised in its prehearing brief that it, too, had sold only

[                    ] in the United States. C.R. 53 at 3. Thus, the volumes of non-circular product

reported in the official statistics could not be attributed to [*that producer*].

Through its final investigation, the Commission staff sought to resolve the identified

discrepancies. The information developed, confirmed, and corroborated by the Commission through

correspondence with importers and foreign suppliers, as well as proprietary Customs sources,

eventually enabled the Commission to reconcile the data, and resulted in the adjustments to the

[*Company A*] data. The evidence supporting those adjustments includes: (1) the certified importers'

questionnaire response which [*Company A*] submitted in the preliminary investigation, listing

imports of SSWR from [*a country other than Germany*] only – [

                    ] (C.R. 102); (2) the certified foreign producers' questionnaire response, with cover

letter, submitted by the German supplier/manufacturer [                    ], confirming [*its product line*]

(C.R. 568; *see also* C.R. 81, <u>Final Staff Report</u> at IV-3 n.4); (3) proprietary Customs entry data

showing that all material entered by [*Company A*] in the relevant period and listed as "German" was

classified as [*a particular type of steel product, under a particular subheading of the HTSUS*] – the

product category which was confirmed [

                                ] (C.R. 263); and (4) confirmation that the data

provided by [*Company A*], the data listed in the CNIF import files, and the official import data, all

matched and cross-checked.  C.R. 81, <u>Final Staff Report</u> at IV-3.

In short, contrary to the claims of the Domestic Industry, there is ample evidence in the

record to support the Commission's adjustment to the official data, excluding the [*Company A*]

material.

The Domestic Industry's arguments concerning [*Company A's*] obligations *vis-a-vis* Customs

are similarly unavailing.  As Krupp notes, there is no evidence on the record to substantiate any

claim that [*Company A*] lied, either to Customs or to the Commission.  It is entirely possible that any

misclassification was entirely inadvertent.  *See* Defendant-Intervenors' Brief at 46.

Moreover, while it may be true that there is no record evidence that [*Company A*] reported

its misclassification to Customs, it is equally true that there is no evidence that the company failed

to make any necessary subsequent disclosures. Defendant's Brief at 30 n.38; Defendant-Intervenor's

Brief at 47.  And, indeed, what evidence there is on the record cuts against the Domestic Industry's

position: [*Company A*] did, in fact, advise the Commission staff that it would be contacting its customs broker to ascertain whether merchandise had been misclassified. C.R. 426.

Further, there is no merit to the Domestic Industry's implication that any inconsistencies between the information that [*Company A*] reported to the Commission and that reported to Customs necessarily renders the information furnished to Customs the only information on which the Commission could reasonably rely. Customs' responsibility for classifying imports for the purpose of assessing duties does not detract from the Commission's independent obligation to compile the necessary information required for its analyses. Other agencies are not bound by Customs' classifications. *See*, *e.g.*, Royal Business Mach., Inc. v. United States, 1 CIT 80, 507 F. Supp. 1007, 1014 n.18 (1980), *aff'd*, 669 F.2d 692 (CCPA 1982).

It is beyond cavil that the Commission is entitled to supplement information from official statistics with the information that it gathers during its own investigation, and – after weighing the evidence – to choose to rely upon one set of facts over the other. Indeed, the Commission routinely relies on information it gathers in the course of its investigations, even when that data conflicts with other official statistics on the record; and the Commission has been repeatedly upheld when it has done so. *See*, *e.g.*, Texas Crushed Stone Co. v. United States, 17 CIT 428, 822 F. Supp. 773, 781 (1993), *aff'd*, 35 F.3d 1535 (Fed. Cir. 1994); *see generally* Defendant's Brief at 27-31.

Here, the Commission obtained specific, detailed information about the merchandise at issue that was not previously available to Customs. The record before the Commission thus included different – or additional – information from that which Customs used in its classification. The

Commission responsibly reviewed its own administrative record and, based on those facts and drawing on its expertise, reached an informed conclusion as to the appropriate adjustments to be made to the data used for its negligibility determination.

The Domestic Industry's second challenge to the Commission's reliance on information provided by [*Company A*] rests on its complaint that the information was not submitted in the form of a certified questionnaire response. *See* Plaintiffs' Brief at 7, 21-22. While it is true that [*Company A*] did not return the importers' questionnaire in the final phase of the investigation, the company was responsive to the Commission's requests for information. C.R. 550.

More to the point, the information that [*Company A*] submitted in the final phase of the investigation confirmed and was consistent with information that it had previously submitted. The Domestic Industry thus conveniently ignores [*Company A's*] importers' questionnaire response submitted in the course of the Commission's preliminary investigation – which *was* certified, and which indicated that the company had imported SSWR only from [*a country other than Germany*] and that [                                                                                        ] throughout the relevant period. C.R. 102; *see also* C.R. 81, Final Staff Report at IV-3 n.4.[10]

---

[10]The Domestic Industry similarly ignores the existence in the record of a certified response to the foreign producers' questionnaire that was submitted in the final phase of the investigation by the supplier [                                    ]. That certified questionnaire response further corroborated both the questionnaire response submitted by [*Company A*] in the preliminary investigation and the company's statements to the Commission in the final phase of the investigation, to the effect that it had imported [      ] SSWR from Germany during the period at issue. C.R. 568; *see also* C.R. 81, Final Staff Report at IV-3, n.4.

## B. [*Company B*] Adjustments

The Commission's adjustments to the official statistics were not confined to the data on [*Company A*]. The Commission also adjusted the official statistics to reflect information supplied in the investigation indicating that a portion of [*Company B's*] imports of SSWR that were declared to Customs as being of German origin were actually of [*another (i.e., second) country*] origin. Specifically, based on the handwritten notations on the [*Company B*] worksheet, the Commission determined the origin of [*a very high*]% of the [*Company B*] shipments at issue. The Commission further determined that – of that [*very high*]% – approximately [     ]% were actually of [*second country*] origin, while only approximately [        ]% were of German origin. The Commission allocated the remaining [      ]% of the material – the so-called "unknown" material – between [*the second country*] and Germany, based on the [*ratio derived from the material for which the countries of origin were known*]. *See generally* Defendant's Brief at 34.

Just as it objected to the adjustments to the data on [*Company A*], so too the Domestic Industry contends that the Commission's adjustments to the [*Company B*] data are not supported by substantial evidence on the record, and are otherwise contrary to law. *See generally* Plaintiffs' Brief at 14-21; Plaintiffs' Reply Brief at 16-30.

The Domestic Industry first attacks the Commission's reliance on the worksheet. The Domestic Industry portrays the [*Company B*] data as a "moving target," emphasizing that Customs records indicated that all the [*Company B*] merchandise at issue was of German origin; that – in the course of the investigation – [*Company B*] initially advised the Commission that the merchandise was [     ]% German and [       ]% [*from the second country*]; and that only after [*Company B*] was pressed to provide a more specific breakdown did it provide the worksheet with handwritten

notations on country of origin, from which the Commission staff derived the [*ratio which the staff then used to allocate the "unknown" material between Germany and the second country*]. Plaintiffs' Brief at 16-19; Plaintiffs' Reply Brief at 16-23. All in all, the Domestic Industry seeks to impugn the credibility of [*Company B*], and to challenge the "accuracy, reliability, and probative value" of the information provided by the company on which the Commission's adjustments were based. Plaintiffs' Brief at 14.[11]

The Domestic Industry charges that [*Company B's*] worksheet reflects nothing more than the company's "estimates," and that its figures lack any corroboration. Plaintiffs' Brief at 15; Plaintiffs' Reply Brief at 18. However, [*Company B's*] worksheet was no "estimate"; it was a shipment-by-shipment "reconstruc[tion]," annotated by the hand of the president of the company to indicate country of origin. C.R. 496. Nor is the record lacking in evidence to substantiate [*Company B's*] claims.

The Commission specifically confirmed that [*Company B's German supplier*] – listed as the manufacturer in the official statistics – simply does  not manufacture SSWR. C.R. 81, <u>Final Staff Report</u>, at F-18 (table f-8) n.1; C.R. 280; C.R. 274; C.R. 396 at 5; C.R. 592. In addition, German SSWR producers had separately informed the Commission that the official statistics on SSWR imports appeared to be inaccurate (overstating imports from Germany), and had requested that the Commission investigate the matter further. C.R. 270. Moreover, the total imports which [*Company B*] reported to the Commission were virtually identical to the totals listed for the company in the

---

[11]It is again worth reiterating that, as a general matter – as noted in section II. A. above – evaluation of the credibility of sources is largely reserved to the trier of fact, the Commission.

official statistics. C.R. 81, <u>Final Staff Report</u>, at F-18-19 (Table F-8) n.4 (and revisions at C.R. 89).[12]

Thus, there is substantial evidence in the record to support both [*Company B's*] claims and the

Commission's determination that adjustments to the official statistics were needed. Moreover,

although the Domestic Industry characterizes as "arbitrary" the country-of-origin breakdown set forth

in [*Company B's*] worksheet (Plaintiff's Brief at 15), they point to no evidence and advance no

arguments to support their skepticism, other than their general attacks on [*Company B's*]

credibility.[13]

      As with [*Company A*], the Domestic Industry seeks to make much of the fact that there is no

record evidence that [*Company B*] ever reported its misclassifications to Customs. *See* Plaintiffs'

Brief at 17; Plaintiffs' Reply Brief at 17 n.17. However, as discussed in section II.A, there is also

no evidence that [*Company B*] *failed* to make any necessary disclosures. *See also* Defendant's Brief

at 36; Defendant-Intervenors' Brief at 54. With the record in equipoise on this point, it provides no

grounds to second-guess the Commission's determination.

      In a further effort to undermine [*Company B's*] credibility, the Domestic Industry questions

the motivation behind the company's statements, asserting that an interest in obtaining a lower

[       ] dumping margin would have given [*Company B*] an incentive to lie. *See* Plaintiffs'

Brief at 17-18. However, that concern is largely disposed of by Krupp's observation that, "[b]y

---

[12]The Domestic Industry minimizes the probative value of this correlation. *See* Plaintiff's Reply Brief at 20-21. Although – considered alone – it may not be compelling, it has at least some probative value. And, as discussed above, it is buttressed by other information corroborating [*Company B's*] statements, and justifying the Commission's adjustments.

[13]As discussed in greater detail below, there is evidence in the record of a relationship between the country of origin of a given shipment, and the manufacturer's "heat codes."

definition, the imports at issue *all* were made before the antidumping petitions were even filed and, therefore were never subject to an antidumping-related suspension of liquidation, let alone an assessment of antidumping duties. Consequently, the origin of the entries could not possibly have any impact on the potential liability for antidumping duties. Furthermore, because the importer at issue [                                                     ], the importer would have been free to source future imports elsewhere in the event that substantial dumping margins were imposed." Defendant-Intervenors' Brief at 54-55.

Similarly, the Domestic Industry's assertion that [*Company B*] had an incentive to lie because it was "keenly aware" that its responses could affect the outcome of the case for Germany is sheer speculation. *See* Plaintiff's Brief at 18. Indeed, as Krupp points out, the only authority cited by the Domestic Industry to support its claim is a letter that is addressed not to [*Company B*], but to another, unaffiliated importer. Defendant-Intervenors' Brief at 55.

While the Domestic Industry objects generally to the [*specific ratio*] derived from [*Company B's*] worksheet, it takes particular exception to the Commission's extrapolation of that ratio to the [   ]% of the material that the ITC Staff deemed to be of unknown origin. Plaintiffs' Brief at 18-21; Plaintiffs' Reply Brief at 23-25. The Domestic Industry complains that the Commission "not only rejected official statistics when the importer claimed to have conflicting information, it also rejected official statistics even when the importer had no information indicating a conflict." Plaintiff's Brief at 18. According to the Domestic Industry, where "[*Company B*] did not even provide a *guess* as to the origin of particular material, the staff gave the company the best treatment possible for the missing data." *Id.*

Indeed, the Domestic Industry claims that the only record evidence as to the country of origin of the [*so-called "unknown" material*] is the Customs declaration made at the time the materials were entered. According to the Domestic Industry, that "unrebutted" record evidence identifies the [      ] "unknown" material as German, and the Commission should have treated it as such. *See* Plaintiffs' Brief at 19; Plaintiffs' Reply Brief at 17 n.18, 23, 25.

But, contrary to the Domestic Industry's claims, the Customs declarations do not stand "unrebutted." In the course of the investigation, [*Company B*] – in effect – affirmatively superseded the Customs declaration with the submission of the [*Company B*] worksheet (and with the submission of its questionnaire responses before that). Based on the record before the Commission, it was entirely reasonable for the Commission to apply the [*ratio derived by the staff from the material of known origin*] to the [      ] "unknown" material. Applied to the same general data set from which the ratio was drawn, there was clearly "a rational relationship between the data chosen and the matter to which they are to apply." Manifattura Emmepi S.p.A. v. United States, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992).

In any event, the Domestic Industry's quarrel with the Commission's extrapolation of the [*ratio derived from the material of known origin*] to the "unknown" shipments is of no moment. Even if the Commission had treated [*all the "unknown"*] material as German in origin (as the Domestic Industry urged), it would have had no effect on the Commission's negligibility determination. Although the Domestic Industry repeatedly asserts that – with that assertedly "slight modification" – the German share of imports would have been 3% (and thus above the negligibility threshold), in fact the share would have been only [*less than 3*]%. *Compare* Plaintiff's Brief at 19-20

*with* Defendant's Brief at 35 *and* Defendant-Intervenor's Brief at 57-58.   In short, even if all of the ["*unknown" material*] had been assumed to be German, the negligibility determination would have been unchanged.[14]

Krupp takes it one step further, reasoning that application of the [*ratio derived from the material of known origin*] to the "unknown" [          ] material was not only reasonable, it was actually *conservative*, and ultimately prejudicial to [*Company B*].  *See* Defendant-Intervenors' Brief at 55-56.   As Defendant-Intervenors note, the [*Company B*] worksheet provides, *inter alia*, the manufacturer's "heat code" for each material listed.   Each volume of material specifically identified as German in origin has a [*particular type of*] heat code, while those identified as [*originating in the second country*] have [*a different type of*] heat code.   Defendant-Intervenors' Brief at 56; C.R. 603. As Defendant-Intervenors note, the Commission's worksheet shows that, in each and every case, the "unknown" material has [*the second type of*] heat codes – which are consistent with [*second country*] – rather than German – origin.   Defendant-Intervenors' Brief at 56 - 57; C.R. 496; C.R. 603. Obviously, if the "unknown" [   ]% of [*Company B's*] material had been treated as being entirely of [*second country origin*] (rather than allocated pursuant to the [*ratio derived by the Commission from the material of known origin*]), the German share would have been even further below the negligibility threshold.

---

[14]The Domestic Industry characterizes the distinction between [*less than 3*]% and 3% as "nothing more than hair-splitting, and unreasonable."  Plaintiffs' Reply Brief at 24 n.23.  But the Domestic Industry cannot simply "round up" to reach the 3% threshold.   Throughout its investigation, the Commission consistently calculated import share figures to two decimal places, not one.  *See* Defendant's Brief at 35; Defendant-Intervenors' Brief at 57-58.

Indeed, the Defendant-Intervenors further reason that, in fact, the [*Company B*] worksheet affirmatively identifies the country of origin of *all* the listed material, and that the Commission staff's identification of [      ]% of the material as being of "unknown" origin is the product of a simple misreading of the document. A review of the [*Company B*] worksheet indicates that, as Defendant-Intervenors note, each designation of origin supplied by [*Company B*] is handwritten next to a subtotal (of weight) that corresponds to the preceding series of [*heat codes of one of two different types*] (which, in turn, as discussed above, apparently correspond to country of origin). As Defendant-Intervenors note, it appears that [*Company B*] "was attempting to provide the origin of *all* of the listed material" by specifying the country of origin next to each subtotal. However, as the Commission staff later discovered, some of the subtotals did not include all of the material listed above. It was these few entries that the Commission staff treated as being of unknown origin. *See* Defendant-Intervenors' Brief at 56-57.

The Domestic Industry takes strong exception to the Defendant-Intervenors' interpretation of the [*Company B*] worksheet, dismissing it as *post hoc* rationale unsupported by the record. *See* Plaintiffs' Reply Brief at 17-18. But, contrary to the Domestic Industry's claims, there is explicit support in the record for the asserted relationship between heat codes and country of origin. In a conversation with a Commission staffer, the president of [*Company B*] indicated that a review of heat codes would enable him to provide a more specific country of origin breakdown for [*Company B's*] material. *See* C.R. 492V.

It is, in any event, unnecessary under the circumstances to rely on the Defendant-Intervenors' interpretations of the [*Company B*] worksheet, because there is no need to consider whether the [      ] "unknown" material was actually of German origin. Both the Commission's adjustments

to the official statistics on [*Company B*] and the Commission's negligibility determination as a whole are supported by substantial evidence in the record as it now stands.

### C.   The Path of the Commission's Decisionmaking

As a final challenge to the determination at issue, the Domestic Industry asserts that the Commission failed to articulate an explanation for its use of adjusted data.  Specifically, the Domestic Industry contends that the negligibility determination lacks a rational basis, because it is assertedly "not clear from the Commission's determination that any commissioner was aware of the concerns raised by the domestic industry, and that the commissioners had an opportunity to consider these important issues in reaching their determination." Plaintiffs' Reply Brief at 30. *See generally* Plaintiffs' Brief at 23; Plaintiffs' Reply Brief at 30-31.

However, the Commission is presumed to have considered all evidence in the record in reaching its determinations "absent a showing to the contrary." USEC Inc. v. United States, 34 Fed. Appx. 725, 2002 U.S. App. LEXIS 7845, at **14 (Fed. Cir. 2002).  Here, the Domestic Industry proffers no evidence that the Commission failed to consider its views regarding the adjusted imports data.  Indeed, the Domestic Industry expressly concedes that "it is possible that [the Commissioners] did read some of the staff notes and footnotes to tables that mentioned [the concerns of the Domestic Industry] . . . ."  Plaintiffs' Reply Brief at 31.

Moreover, the Domestic Industry's arguments in this action go to the *evidentiary basis* for the Commission's negligibility determination (*i.e.*, its adjustments to the official statistics).  While the Commission is required to address the facts and conclusions of law upon which its determination is based, it "is not required to address every piece of evidence presented by the parties . . . ." USEC

Inc., 2002 U.S. App. LEXIS 7845, at **14; *cf*. Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,

Inc., 419 U.S. 281, 290 (1974) (affirming the Commission's action where the court was able to

"discern in the Commission's opinion a rational basis for its treatment of the evidence . . . .").

Applying these standards, the Commission's determination here clearly passes muster.

## IV.    Conclusion

For the reasons set forth above, the Commission's negligibility determination in this matter

is supported by substantial evidence on the record and is otherwise in accordance with law.

Plaintiffs' motion for judgment on the agency record is therefore denied, and the Commission's

negligibility determination in Stainless Steel Wire Rod From Germany, Italy, Japan, Korea, Spain,

Sweden, and Taiwan, 63 Fed. Reg. 49,610 (Sept. 16, 1998) is sustained.  This action is dismissed.

Judgment will enter accordingly.


                                                      /s/ Delissa A. Ridgway
                                                            Judge


Decided:   December 16, 2003
              New York, New York